IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 23, 2019

## DANNY SANTARONE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Sullivan County**
**No. C66904  James F. Goodwin, Jr., Judge**

_____

### No. E2018-01312-CCA-R3-PC

_____

Petitioner, Danny Santarone, appeals the denial of his petition for post-conviction relief. Petitioner argues (1) that he was wrongfully convicted based on the fruits of an unconstitutional search and (2) that he was denied effective assistance of counsel. Following a review of the briefs and the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JR., JJ., joined.

Samuel E. White, Kingsport, Tennessee, for the appellant, Danny Santarone.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Barry Staubus, District Attorney General; and Barry Carrier, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Background Leading to Conviction*

Petitioner was indicted by the Sullivan County Grand Jury for possession of dihydrocodeinone within 1,000 feet of a school with the intent to sell or deliver, possession of oxycodone within 1,000 feet of a school with the intent to sell or deliver, possession of drug paraphernalia, possession of .5 grams or more of cocaine within 1,000 feet of a school with the intent to sell or deliver, and possession of heroin within 1,000 feet of a school with the intent to sell or deliver. The trial court dismissed the drug paraphernalia charge at the request of the State prior to trial. Following a jury trial,

Petitioner was convicted on all counts. Affirming his convictions on appeal, a panel of this Court summarized the proof presented at Petitioner's trial:

On Saturday, July 16, 2011, Matthew Henriksen, an operations manager with Federal Express ("FedEx") in Blountville, was monitoring a conveyor belt of newly-arrived packages when he noticed an envelope that was bulging open, revealing what appeared to be a large prescription bottle. The package was addressed to Defendant at an address in Johnson City. Upon further inspection, the label on the bottle appeared to be worn, and the packaging was inconsistent with a shipment from a pharmacy. Suspicious, Mr. Henriksen contacted Detective Burk Murray of the Sullivan County Sheriff's Office. Detective Murray asked Mr. Henriksen to try to identify the pills in the bottle. Mr. Henriksen pulled out of the bottle some brown paper, a clear bag with white powder in it, and some yellow pills that appeared to be consistent with Vicodin. Detective Murray then came and took possession of the package. Mr. Henriksen suggested that he could tell the intended recipient that the package had been delayed because the truck it was on had broken down.

After the scheduled delivery time of noon had passed, Defendant contacted FedEx and inquired about the package. The employee who spoke with him informed Defendant that the package had been delayed. Mr. Henriksen instructed the employee to let Defendant know that they would stay open thirty minutes after their normal closing time if he wanted to pick up the package that day, otherwise it would be delivered the following business day. Defendant insisted on picking the package up that day and asked for directions to the FedEx facility.

Mr. Henriksen called Detective Murray to let him know that Defendant would be coming to pick up the package. Detective Murray did not have time to set up a controlled delivery in a different county, so he brought the package back to the FedEx facility and Mr. Henriksen repackaged it. Detective Murray had patrol units set up on either side of the FedEx facility so that they would be able to intercept Defendant if he left in either direction. Detective Murray parked in the parking lot next door so that he could observe when Defendant arrived.

Around 3:30 p.m., Defendant arrived with his daughter, Rachael Santarone. The FedEx employees unlocked the door for them. Defendant signed for the package, took possession of it, and left. Mr. Henriksen called Detective Murray to let him know that Defendant left with the package. Detective

- 2 -

Murray was able to identify Defendant from the driver's license photo that corresponded to the name and address on the package.

Officer Jessie Nunley of the Sullivan County Sheriff's Office parked his vehicle where he could observe Defendant's vehicle if he left the FedEx facility and headed toward the airport. Another officer set up on the other side of the FedEx facility in case Defendant left traveling in that direction. Detective Murray radioed that Defendant had left toward the airport and described his vehicle as a green Isuzu. Officer Nunley saw the vehicle pass his position, turned out behind it, and initiated a traffic stop. Defendant stopped his vehicle on Highway 75, and Officer Nunley directed him to pull over on a side street out of traffic. Both the initial stop location and the side street were within 1000 feet of the real property of Holston Elementary School.

Both Defendant and his daughter were removed from the vehicle and arrested. When the police officers searched the vehicle, they recovered the FedEx package from the center console, an ibuprofen bottle from the driver's side floorboard, and a Tylenol bottle, a small prescription bottle, a set of brass knuckles, and a cut off straw in Rachael's purse. The FedEx package contained a large prescription bottle in the name of Sabrina Fisher, two small baggies containing white powder, and a broken yellow pill. Agent Carl Smith, a forensic scientist with the Tennessee Bureau of Investigation, tested the various pills and powders found in Defendant's vehicle. Within the FedEx package, Agent Smith identified 110 tablets of dihydrocodeinone, 1.3 grams of cocaine, .14 grams of heroin, and 43 tablets of oxycodone; Agent Smith did not identify the broken yellow pill. The small prescription bottle found in Rachael's purse, which was labeled as a prescription of oxycodone for Linda Santarone, contained 59 and a half tablets of hydromorphone. The Tylenol bottle found in Rachael's purse contained 33 tablets of oxycodone. The ibuprofen bottle found on the driver's side floorboard contained 69 tablets of a different brand of oxycodone.

Rachael Santarone, Defendant's daughter and Co-defendant, testified for the State at trial. In December of 2010, when Rachael was eighteen years old, she came to live with her father and stepmother in Tennessee. Prior to that, she was living in Florida with her mother. She admitted that she was addicted to oxycodone and that her drug problem was the reason her parents decided that she should move away from Florida. However, Rachael would obtain pills from her father and her drug problem got worse

while she lived with him. After their arrest, she moved out to live with her boyfriend.

Rachael testified that Defendant, her stepmother, and her adult stepsister were unemployed from the time she moved in in December 2010 until she and Defendant were arrested in July 2011. During this time, Defendant and her stepmother traveled to Florida about once a month. Upon their return, Rachael would notice both an increase in the number of visitors to their home as well as an improvement in the family's finances. The visitors would occasionally go to a back bedroom for a few minutes and then leave. On one occasion, Rachael was in the car with Defendant when he exchanged pills with a man for money, but she did not know the man's name or how many pills Defendant gave him. Rachael recognized the pills as oxycodone because she was addicted to them at the time. Rachael also recalled that Defendant often received packages from Florida. Some of these packages were addressed to Rachael, and she became upset with Defendant and asked him to tell his friends to no longer address the packages in her name.

On July 16, 2011, Defendant woke Rachael from a nap and asked her to go with him to the FedEx office to pick up a package. She was suspicious that the package contained drugs. Rachael entered the FedEx facility with Defendant. Defendant signed for the package, then brought it back to the car. He placed the package in the center console without opening it. Also in the center console were three smaller pill bottles. When Defendant was being pulled over by the police, he told Rachael to put the smaller bottles in her purse. She described the situation as "chaotic," and one of the bottles did not end up in her purse. She denied that the pill bottles were hers or that she knew they were in the car. She admitted that the brass knuckles and the straw found in her purse were hers and that she used the straw to ingest oxycodone.

Rachael made a statement to the police the day after her arrest. She denied that the police made her any promises in exchange for her statement. In exchange for her truthful testimony, Rachael pled to the reduced charges of possession of dihydrocodeinone, a Class D felony, and of possession of oxycodone, a Class C felony, as well as misdemeanor possession of drug paraphernalia and possession of a prohibited weapon. The charges of possession of cocaine and heroin for sale or delivery within 1000 feet of a school were dismissed. Rachel received a probationary sentence. Defendant's wife, Linda Santarone, testified on her husband's behalf. She

explained that she and Defendant had legitimate prescriptions for oxycodone to cope with the pain associated with various injuries. Even though they had been living in Tennessee for five years, Linda and Defendant still obtained their prescriptions from a pain management doctor in Florida. In 2011, they were each prescribed 360 oxycodone pills and 90 Xanax per month. She explained that the couple drove to Florida every month to obtain their pills as well as visit family and friends.

Linda testified that Defendant, who had made his living as a carpenter, was unable to work due to his various injuries. She explained that they were able to pay for their medications and trips to Florida with money that Defendant received as an inheritance after his father passed away, as well as from buying and selling cars and jewelry and from back child support payments. She denied that either she or Defendant sold any of their pills.
Linda explained that a lot of friends came to help around the house after Defendant broke his leg. She denied that there would be an increase in visitors after the couple returned from Florida or that they would meet anyone privately in a back bedroom. Even though Linda had earlier testified that she and Defendant always took all of their prescribed medication, she testified that both she and Defendant would regularly give pills to friends who said they were in pain, and the friends would repay them in kind once their own prescriptions had been filled. She also testified that she noticed some of her pills would go missing in large quantities after Rachael moved in with the family.

On cross-examination, Linda admitted that Defendant was obtaining pain medication from a doctor in Tennessee after he broke his leg as well as continuing to obtain medication from the doctor in Florida. By the time of trial, she and Defendant were no longer seeing the doctor in Florida and were obtaining their pills from a pain management doctor in Knoxville.

She denied that Defendant received regular packages from Florida but stated that Rachael often received packages. Linda explained that they put the oxycodone pills in the Tylenol and ibuprofen bottles to try to hide them from Rachael. She denied that the hydromorphone in the old oxycodone prescription bottle belonged to her. Linda testified that Sabrina Fisher, the name on the large prescription bottle in the FedEx package, was the girlfriend of John Balmer, a friend of Defendant's from Florida.

Amber Phelps, Linda Santarone's daughter and Defendant's stepdaughter, also testified for the defense. Ms. Phelps testified that she was the only one

in the household who did not use drugs. She admitted that her parents had a drug problem and that they would exchange pills with others who had prescriptions. She denied that they ever bought or sold pills. Ms. Phelps testified that she had seen her stepsister Rachael steal pills from her parents on a few occasions. She said that Rachael was using both oxycodone and cocaine and that Rachael was getting the drugs in packages sent from Florida by Rachael's mother. She characterized Rachael as a habitual liar. Defendant testified on his own behalf. He testified that he had various injuries from his years of working as a carpenter and that he could no longer work due to his injuries. He was prescribed medication by a pain management doctor in Florida. Both he and his wife were prescribed 360 oxycodone pills per month. Defendant testified that he has since started seeing a doctor in Tennessee and that his prescription had been reduced to 148 pills per month.

Defendant testified that in July 2011, a friend of his from Florida named John Balmer was coming to Tennessee to visit Defendant. Defendant was expecting a package to be delivered to his house prior to Mr. Balmer's arrival. Defendant knew that the package was to be delivered on Saturday and that Mr. Balmer would be arriving a day or two after. When the package did not arrive as scheduled, Defendant called FedEx. He was told that the package could not be delivered because the truck had broken down and that he would have to pick up the package. Defendant drove to the FedEx facility with his daughter, Rachael, following the directions given to him over the phone. On cross-examination, Defendant testified that he was insistent on picking up the package that day because the FedEx employee did not provide a redelivery date and he wanted to be sure that he had the package when Mr. Balmer arrived.

Defendant denied that he put the drugs in Rachael's purse when they were pulled over, but admitted that he did have a bottle of oxycodone in the center console of the car. He stated that he had not opened the FedEx package and that he did not know what was inside of it. He explained that he intended to take the package home and store it until Mr. Balmer arrived. Defendant denied that he used heroin or hydrocodone. He admitted that he had been convicted of selling cocaine over 15 years ago but denied that he currently uses cocaine. Defendant admitted knowing that there would be prescription medication in the package, but denied knowing that the cocaine or heroin would be in there. He denied ordering any of the contents of the package.

The jury convicted Defendant as charged of possession of dihydrocodeinone within 1000 feet of a school with the intent to sell or deliver, possession of oxycodone within 1000 feet of a school with the intent to sell or deliver, possession of cocaine within 1000 feet of a school with the intent to sell or deliver, and possession of heroin within 1000 feet of a school with the intent to sell or deliver. After a sentencing hearing, the trial court sentenced Defendant to concurrent sentences of 6 years for the dihydrocodeinone conviction, 12 years for the oxycodone conviction, and 25 years for both the cocaine and the heroin convictions. On July 11, 2014, the trial court denied Defendant's motion for a new trial. Defendant then filed a notice of appeal.

*State v. Santarone*, No. E2014-01551-CCA-R3-CD, 2015 WL 5766684, at *1-4 (Tenn. Crim. App. Oct. 1, 2015).

### Post-Conviction Hearing

Petitioner filed his petition for post-conviction relief on July 22, 2016. On March 16, 2018, the trial court held an evidentiary hearing, and three witnesses were called to testify.

Petitioner was the first witness to testify at the hearing. He stated that he was represented by trial counsel for his jury trial and that appellate counsel represented him on his appeal. Petitioner recounted that on the day of his arrest he had received several calls from a friend about a package that was supposed to arrive at his house. He testified that his daughter called FedEx to inquire about the status of the package, and an employee told her that they were going to track the package and call her back. Petitioner explained that after multiple phone calls, he was told that he needed to come pick the package up from the store because it could not be delivered. He stated that he went to the store to retrieve the package following their conversation. After leaving the store with the package, Petitioner testified that he was driving down the road "about [a] quarter, half a mile" when he noticed two police officers pull behind him and in front of him with their vehicles' lights on. Petitioner stated that the officers inquired about the package in between his seat. He said he "threw it between the seat not opening it" and that the officers "searched [his] vehicle and arrested [him and his daughter]."

Petitioner testified that he felt that the location of his arrest was "deliberate" and that law enforcement had planned to stop him in that particular place. He believed that the officers could have arrested him while he was in the parking lot of the FedEx store, instead of waiting until Petitioner entered a school zone. Petitioner testified that he did not find out he was stopped in a school zone until "way later in the proceeding[,]" and

that he believed the FedEx worker and law enforcement worked together to arrest him. Additionally, Petitioner testified that he told law enforcement that the package contained his friend's medication.

Regarding trial counsel's representation, Petitioner testified that he hired trial counsel in 2012. He stated that while he and trial counsel met about "four or five times" before his trial, there were some times where Petitioner tried to meet with him and it was unsuccessful. During their meetings, Petitioner stated that he gave trial counsel his medical records, any potential witnesses, cell phones, phone records, and pharmacy records. He explained that he gave trial counsel that information because he wanted to prove that the pills in his car were from a legal prescription and to refute the co-defendant's testimony. However, he believed trial counsel did not use any of the information given to him for Petitioner's defense.

Petitioner testified that there were four witnesses that were important to his defense. He stated that two of the witnesses were the individuals who sent the package to Petitioner. Another witness was a woman who lived with Petitioner's daughter and heard his daughter talking about the trial. However, Petitioner believed his trial counsel did not take any interest in pursuing any of them.

Petitioner testified that in his discussions with trial counsel, he was not advised of the maximum sentence for what he was charged. Additionally, he stated that trial counsel did not seem to know everything that he should have known for Petitioner's plea offer. Petitioner believed trial counsel did not adequately investigate his case. Further, Petitioner stated that his trial counsel should have asserted an entrapment defense at trial. He explained that there were discussions about using entrapment as a defense but that trial counsel never brought it up. Petitioner believed the defense was important because law enforcement "forced [Petitioner] to come pick up the package" and then arrested him in a school zone.

Additionally, Petitioner stated that he was concerned about his co-defendant testifying against him. He believed that "she'd lie and perjure herself to obtain a plea bargain offer by the [S]tate[.]" He stated that he expressed these concerns with his trial counsel, but trial counsel never filed any pretrial motions to suppress her testimony. Petitioner testified that trial counsel should have tried to suppress her testimony because she was an accomplice to the crime. In addition, he believed the suppression would have been better handled prior to, rather than during, the trial.

Petitioner testified that he was surprised at the length of his sentence. He stated that trial counsel remained his attorney when he filed a motion for a new trial. However, Petitioner was appointed a new counsel for his appeal. Regarding his appeal, Petitioner

stated that he was dissatisfied with this Court's opinion because this Court failed to discuss the entrapment issue. Overall, Petitioner felt that his trial counsel's representation was ineffective.

On cross-examination, Petitioner acknowledged that his trial counsel had "very vast experience" in criminal law. He affirmed that trial counsel had 30 years of experience as a prosecutor and would know where "holes" should be in a prosecutor's case. He did not believe trial counsel had any conflicts of interest with his case. He acknowledged that trial counsel cross-examined the witnesses at Petitioner's trial and testified that trial counsel had "done okay on" tripping up the witnesses.

Petitioner stated that trial counsel did not "say much of what was going to happen" and that he did not "keep [Petitioner] informed even throughout the whole course of [his trial.]" Petitioner conceded that his name was not on any of the prescription bottles for the medication but stated that his prescription was kept "in an Ibuprofen bottle or something like that." Petitioner was unsure if it was established at trial that he was taking the medications or that he was addicted to them.

Petitioner acknowledged that the potential witnesses for his defense were not actually at the scene of his arrest or the FedEx office. He also conceded that he knew medications were controlled under the law. Petitioner also recalled talking to trial counsel about plea offers, and he believed that the State offered him eight years to be served at 85%. However, he conceded that after discussion, he rejected the State's offer.

On the day of his arrest, Petitioner recalled that he did not talk to any law enforcement prior to arriving at the FedEx store and that the only discussion about coming to pick up the package was with a FedEx employee. He conceded that law enforcement did not force him to pick up the package. Additionally, Petitioner stated that he had no training in law and acknowledged that there are rules in law that do not necessarily allow the suppression of certain things. He stated that he would not have expected trial counsel to do anything to violate those rules.

On redirect, Petitioner explained that he believed the witnesses from Florida could have testified to the fact that they were on their way for a visit and were going to retrieve the package that Petitioner had picked up. He reaffirmed that he believed the package had his friend's medication in it. He testified that he made "personal efforts" to try and understand what was going on in his case even though he was not a lawyer, and he did not feel that trial counsel fully investigated his case or talked to all of the witnesses. Petitioner stated that he felt that "there could have been done more to, put more investigation into [his case]" on the part of his trial counsel. Additionally, Petitioner acknowledged that the witnesses who trial counsel did not call to testify, would not have

contradicted the basic facts in his case that he went to pick up the package containing narcotics and that law enforcement stopped him after he left the FedEx office.

Petitioner's appellate counsel testified at the evidentiary hearing. He stated that his main argument on appeal was concerning the school zone enhancement factor in Petitioner's case. He explained that he had argued a similar case with the same issue before a panel of this Court but that in his former case, this Court failed to address his issue. Therefore, he explained that he wanted to "lookout for a case that [he] could take on [the same] issue again because [he] thought it was a good issue." He stated that he had done research on the legislative history of the school zone enhancement factor. He argued that it was against public policy for law enforcement to allow defendants to enter the school zone when they could have been arrested in another location outside of it. Additionally, appellate counsel stated that he raised the credibility issue for Petitioner even though he felt that it was not a strong issue to raise.

Appellate counsel testified that he presented oral arguments to a panel of this Court on Petitioner's case. He explained to this Court that the school zone was intended to be a safe harbor and that law enforcement should not be given "credit" for putting a defendant in that safe zone. In response to the appeal, appellate counsel stated that this Court held that Petitioner was trying to "backdoor [the issue] as an entrapment[.]" However, appellate counsel stated he did not raise entrapment as an issue on appeal because trial counsel had waived the issue and did not ask for jury instructions on that defense. Appellate counsel added that he believed trial counsel went after the co-defendant in Petitioner's case "vigorously[.]"

Appellate counsel testified that he was passionate about law enforcement not being able to benefit from arrests similar to Petitioner's, and he believed that Petitioner should have been arrested before he entered the school zone. After being asked about limitations with Petitioner's case, appellate counsel testified that he did not feel like he was limited and that he had what he needed for the issue he was raising.

On cross-examination, appellate counsel stated that he had been a public defender full time for 19 years. He stated that from 1993-1999, 70% of his practice was criminal law. Since 1999, 100% of his practice has been criminal law. At the time of Petitioner's case, he had handled other cases before the Tennessee Court of Criminal Appeals and had some experience representing clients in the Tennessee Supreme Court.

Appellate counsel explained that he became involved with Petitioner's case when he was assigned to it by the Public Defender's office. He testified that he raised the accomplice testimony issue because Petitioner wanted him to do so, but he did not

believe it was an issue Petitioner would be successful on because the package itself was evidence enough to corroborate the co-defendant's testimony.

Additionally, appellate counsel explained his belief that there was no merit to a challenge to the search of Petitioner's vehicle:

THE STATE:     In your review of the case did you find any merit in that, anything you could get traction on, on that?

COUNSEL:        No, and then I mean once again an independent third party had noted that the – had found the drugs inside this package. It had opened up and the police officers were informed by the FedEx personnel about this and they set up this little thing. There is no doubt, zero doubt that he picked up, I mean he admitted to that on the stand. I mean picked it up. His reasons for that are, you know, over here but the fact that he had it in his possession, they knew he had it in his possession. I think through, you know, there was that – that really takes the issue away. They now have probable cause once they stop him to get that package which they did.

The last witness called at the evidentiary hearing was Petitioner's trial counsel. Trial counsel stated that he was a defense attorney. He explained that prior to his current occupation, he was a training officer during Vietnam for four years. Following the military, trial counsel worked in private practice for a year and then was an assistant district attorney for ten years. He stated that he then ran successfully for two terms as the District Attorney General. In total, he had 30 years of experience as a prosecutor. Trial counsel explained that he now works in private practice doing "a mixture of legal work[,]" but primarily works on criminal matters.

Trial counsel testified that he reviewed what case law he was familiar with in analyzing the search that Petitioner believed to be unconstitutional, but he felt that "[r]easonable doubt for probable cause certainly existed in [Petitioner's] case." He believed Petitioner's case was "a wonderful case of putting a case together of setting a trap[,]" but was not entrapment. He stated that he searched diligently to find what he could have said to a jury in light of the testimony and other evidence presented against Petitioner. He could not find anything in the record to prove entrapment.

Trial counsel testified that law enforcement could have arrested Petitioner before Petitioner entered the school zone, but trial counsel believed that the undercover officer was only there to observe Petitioner picking up the package containing narcotics. He conceded that the undercover officer could arrest a suspect "if they choose to do that[,]" but generally "if [law enforcement is] approaching someone that is obtaining drugs illegally [they] try to have a backup, at least one and maybe more." Trial counsel stated that he considered the fact that Petitioner was caught in a school zone, but could not find anything in the record to support that an officer was assigned specifically to arrest him in that particular spot. Trial counsel explained that the best defense for Petitioner was to show that he did receive some drugs from Florida, but that he was a "hardworking man" who had become addicted to drugs following treatment for some injuries. Further, he wanted to show that Petitioner's family had also developed a drug problem, but that neither Petitioner nor his family were "drug sellers and drug dealers[.]" His main concern was whether the jury would perceive Petitioner as a drug dealing man or a "fellow who was addicted himself and feeding his own addictions[.]"

Trial counsel could not recall if he specifically told Petitioner that he could be facing a sentence of 25 years. However, trial counsel stated that if he had computed the numbers, it was possible that he told Petitioner that he could receive 20-25 years. Trial counsel acknowledged that he gave notice that he was going to raise entrapment as a defense, but he explained that as the case developed he could not find any motivation by law enforcement to catch Petitioner in the school zone. Further, he stated that he had seen the entrapment issue argued many times and did not believe that he would be able to change the jury's mind on "what has clearly been the law[.]" Trial counsel testified that in Petitioner's case, "the facts were hopelessly clear." Trial counsel testified that he did not know of any motions that could have been pursued to keep the co-defendant from testifying, and he did not believe her testimony would have been excluded.

On cross-examination, trial counsel testified that he received discovery from the State, he received information on Petitioner's medical records, he interviewed witnesses, he attempted to discredit Petitioner's daughter, and he cross-examined the State's witnesses. Trial counsel denied having any conflicts of interest with Petitioner's case. He stated he tried to keep Petitioner informed about things that were happening with the case.

Trial counsel testified that he brought a lot of experience to Petitioner's case. When trial counsel investigated the scene, he discovered that it did not matter which direction Petitioner left the FedEx office because he would be traveling through a school zone in either direction. Trial counsel did not believe there was anything else he could have done in Petitioner's case. Regarding the co-defendant, trial counsel testified that he "vigorously" cross-examined her, and he acknowledged that the credibility of a witness is

for a jury to determine. When redirected, trial counsel recalled that the State offered Petitioner a plea deal either right before court or while in court, which Petitioner rejected.

At the conclusion of the evidentiary hearing, the post-conviction court found that Petitioner was not entitled to relief on his claims. An order was subsequently entered, and Petitioner filed a timely notice of appeal.

## ANALYSIS

### *Unconstitutional Search*

First, we address the stand alone claim Petitioner has asserted in this appeal. Petitioner argues that he is entitled to post-conviction relief because his conviction is based on an unconstitutional search and seizure. Petitioner concedes that there was likely probable cause to arrest him, but he asserts that he was charged and convicted with intent to distribute within 1,000 feet of a school only because law enforcement deliberately stopped him there. Therefore, he argues the drug-free zone enhancement is unconstitutional. The State contends that Petitioner waived this claim by failing to raise it at trial or on direct appeal, and thus, the post-conviction court properly denied it. We agree with the State.

"A post-conviction petition is not a vehicle to review errors of law as a substitute for direct appeal." *French v. State*, 824 S.W.2d 161, 163 (Tenn. 1992). "A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." T.C.A. § 40-30-106(g). Upon review of the record, Petitioner failed to present this issue to the trial court or on direct appeal. Therefore, Petitioner has waived this claim, and he is not entitled to relief on this issue.

### *Ineffective Assistance of Counsel*

Petitioner asserts four claims of ineffective assistance on the part of his trial counsel: (1) trial counsel failed to adequately and fully investigate Petitioner's case; (2) trial counsel failed to file any pretrial motions to suppress evidence; (3) trial counsel failed to adequately argue an entrapment defense; and (4) trial counsel failed to file a pretrial motion to suppress the testimony of Petitioner's co-defendant at trial. The State contends that Petitioner failed to prove by clear and convincing evidence the factual allegations of these claims. We agree.

To obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the

United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her allegations of fact by clear and convincing evidence. T.C.A § 40-30-110(f); *Dellinger v. State,* 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

A defendant has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. at 687. Failure to satisfy either prong results in the denial of relief. *Id.* at 697.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Furthermore, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e. a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

First, Petitioner argues that his trial counsel was ineffective for failing to fully investigate his case. Petitioner contends that trial counsel did not seek out potential evidence for trial, including phone records and potential witnesses and that such evidence could have provided "additional context" for his defense. Only Petitioner, his trial counsel, and his appellate counsel testified at the evidentiary hearing. While Petitioner testified that there were potential witnesses who could have refuted the co-defendant's testimony or proved to the jury that Petitioner was picking up the package for someone

else, he did not present these witnesses at the evidentiary hearing to testify. It has long been established that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Taylor v. State*, 443 S.W.3d 80, 85 (Tenn. 2014) (quoting *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). Without this proof, this Court is unable to determine that trial counsel was either deficient in his investigation of the witnesses or that the lack thereof was prejudicial for Petitioner's case. Additionally, the post-conviction court found that Petitioner lacked credibility regarding trial counsel's investigation with his case:

> Petitioner testified that he only briefly spoke with trial counsel four or five times; and that trial counsel did not discuss pertinent matters with him when they did meet and that trial counsel didn't seem interested in the information that Petitioner tried to provide. However, Petitioner also testified during cross-examination that trial counsel and he discussed the entrapment issue, the school-zone issue, credibility issues with the co-defendant, and that they discussed information the Petitioner was trying to provide. Petitioner contradicts himself during his testimony at the post-conviction hearing. The Court does not credit the testimony of the Petitioner.

The post-conviction further attributed trial counsel's performance by finding that trial counsel had received and reviewed discovery, reviewed the records, took a statement from the co-defendant, cross-examined the State's witnesses, filed pre-trial motions, explained the State's plea offer to Petitioner, and updated Petitioner on his case. Because Petitioner has failed to present any proof of how the alleged lack of investigation prejudiced the outcome of his trial, he is not entitled to relief on this claim.

Second, Petitioner argues that his trial counsel was ineffective for failing to file a pretrial motion to suppress evidence. Specifically, Petitioner asserts that the evidence taken by law enforcement from the search incident to his arrest should have been suppressed by his trial counsel and failure to do so was prejudicial to the outcome of his trial. As previously addressed, this Court has established that a petitioner must present witnesses at his evidentiary hearing if he is asserting that his trial counsel was ineffective for failing to discover, interview, or present witnesses in support of the defense. *Taylor*, 443 S.W.3d at 85. This same standard applies when a petitioner argues that his trial counsel was ineffective for failing to file pre-trial motions to suppress evidence. *Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, *8 (Tenn. Crim. App. Sept. 12, 2011) (no perm. app. filed). In order to show prejudice, a petitioner must show by clear and convincing evidence that (1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded

differently if counsel had performed as suggested. *Id.* In essence, a petitioner should present a motion to suppress hearing within petitioner's evidentiary hearing. *Id.* In the case at hand, Petitioner failed to put on this "hearing within a hearing" to determine the prejudicial value of his trial counsel's failure to file a pretrial motion to suppress the evidence. Without such proof, this Court would be granting relief based on mere speculation, and we decline to do so. Petitioner is not entitled to relief on this claim.

Third, Petitioner asserts that his trial counsel was ineffective for failing to argue entrapment as a defense. Petitioner argues that entrapment was not sufficiently addressed at his trial, and the decision to withdraw entrapment as a defense denied Petitioner "an avenue for defending himself during the appeals process." Petitioner contends that the entrapment defense needed to be properly argued and pursued at the trial level. Trial counsel testified at the evidentiary hearing that he gave pretrial notice of entrapment as a defense, but that as Petitioner's case developed, he could not find facts in the record to support that Petitioner's stop was motivated by law enforcement intentionally arresting Petitioner in a school zone. Additionally, appellate counsel testified that he did not believe entrapment "was a good issue" and that "[e]ntrapment in a drug case is almost impossible to prove." Further, appellate counsel stated that the issue was not "entrapment for drugs" but "trying to do entrapment for an enhancement factor." Petitioner failed to present any proof to show that an entrapment defense would have been successful had it been asserted as a defense at his trial. The post-conviction court found that trial counsel's decision to proceed without entrapment as a defense was not deficient representation, and we agree. Also, the failure to present any evidence for the basis of a defense of entrapment by calling law enforcement witnesses results in the lack of proof of prejudice. *See Taylor*, 443 S.W.3d at 85. Petitioner is not entitled to relief on this issue.

Fourth, Petitioner asserts that his trial counsel was deficient for failing to file a pretrial motion to suppress the testimony of his co-defendant and this deficiency was prejudicial to his defense. Petitioner contends that the co-defendant had "glaring credibility issues" and trial counsel should have filed a motion to suppress her testimony. As previously addressed, when a petitioner asserts that his trial counsel was ineffective for failing to file a pretrial motion to suppress, the petitioner must show by clear and convincing evidence that (1) a motion to suppress would have likely been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested. *Cecil*, 2011 WL 4012436 at *8. Here, Petitioner has failed to present any proof that a motion to suppress his codefendant's testimony would have been granted. In its order denying relief, the post-conviction court also noted the insufficient proof for this claim:

Petitioner admitted on cross-examination that he was not a lawyer and was not familiar with legal rules and procedures. He also conceded on cross that he would not expect his lawyer to do something that was in violation of those rules and procedures. Trial counsel testified that credibility of a witness was the province of the jury, and that he was not aware of any ground by which he could prohibit the co-defendant from testifying.

Further, trial counsel testified at the evidentiary hearing that he was unaware "of any way [he] could have prevented [the co-defendant] from testifying" and that trial counsel addressed the issue of the co-defendant's credibility on cross-examination. Petitioner is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, the judgment of the post-conviction court is affirmed.

_____
THOMAS T. WOODALL, JUDGE